# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSCHUSETTS

| | |
|---|---|
| ROBERT RANCOURT, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| MEREDITH CORPORATION, | |
| Defendant. | |

Plaintiff Robert Rancourt ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

1.     This is a class action suit brought against Defendant Meredith Corporation ("Meredith" or "Defendant") for violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, and Mass. Gen. Laws ch. 93 § 106 (the "MVPA").

2.     Defendant develops, owns, and operates a mobile application, titled "Allrecipes" ("Allrecipes App" or the "App"), which hosts and delivers "[t]housands of recipe videos to guide you with step-by-step cooking instructions."[1]

3.     Unbeknownst to Plaintiff and members of the Classes, however, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties.

---

[1] ALLRECIPES, https://play.google.com/store/apps/details?id=com.allrecipes.spinner.free&hl=en_US&gl=US.

4.      The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

5.      The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710.  "Personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

6.      Similarly, the MVPA prohibits any entity "engaged in the business of leasing or renting videos or any employees thereof" from "mak[ing] available to a third party records that would indicate the name of the borrower or the title or category of any video leased or rented by a borrower."  Mass. Gen. Laws. ch. 93 § 106.

7.      Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA and MVPA.

## FACTUAL BACKGROUND

**I.   The VPPA And The MVPA**

8.      The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

9.      In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

10.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

11.     Similar to the VPPA, the MVPA prohibits entities "engaged in the business of leasing or renting videos," like Defendant, from "mak[ing] available to a third party records that would indicate the name of the borrower or the title or category of any video leased or rented by a borrower." Mass. Gen. Laws. ch. 93 § 106. As courts have recognized, the MVPA codifies a "protected privacy interest" in "video viewing histor[y]."

## II.     Setup And Use Of The Allrecipes App

12.     Defendant develops, owns, and operates the Allrecipes App.

13.     Consumers can download the Allrecipes App through the Google Play Store on Android devices or the Apple App Store on iOS devices.  Once downloaded, the Allrecipes App requests permission from users to access their location through the mobile device's GPS and to send push notifications to the device.

14.     At no point does Defendant receive permission from users to share their location information, personally identifiable information, or video viewing information with third parties.

15.     Consumers can use the Allrecipes App to view videos of recipes being prepared.

**III.  Testing Reveals That Defendant Is Illegally Sharing Users' Video-Viewing Information With A Third Party**

16.      In the Winter of 2022, Plaintiff's counsel retained a private research company to conduct a dynamic analysis of the Allrecipes App.  The researchers analyzed the disclosures made from Allrecipes to third parties when watching a video showing meal preparation.

17.     The analysis first established that Defendant incorporates multiple "application programming interfaces" ("APIs") into its App.

18.     APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[2]

19.     Google Analytics is an example of an API.  When developers, like Defendant, integrate the Google Analytics API into their applications, Google will "create reports to answer questions like: How many daily active users has my Android app had in the last week?  How many page views has each of the top 10 page URLs for my site received in the last 28 days?"[3]   In

---

[2] IBM CLOUD EDUCATION, APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[3] GOOGLE ANALYTICS, ANALYTICS DATA API OVERVIEW, https://developers.google.com/analytics/devguides/reporting/data/v1.

exchange, Google retains and repurposes the data the application transmits, which Google then uses to support other ventures, like targeted advertising.

20.    Defendant integrates into its App the Segment API, an API owned and operated by Twilio Inc.

21.    The dynamic analysis found that when a user creates an App account, Defendant discloses to Twilio, through the Segment API, a user's geolocation, account or member ID, advertising ID, and a unique video identifier of the video(s) viewed by the user.  This information sufficiently permits an ordinary person to identify a specific person's video-viewing behavior.

### A.    Overview Of The Segment API

22.    When developers build a mobile application, they typically outsource particular functions, like marketing and analytics, to third party providers.  Twilio is one such third party.

23.    Twilio is "a customer engagement platform used by hundreds of thousands of businesses and more than ten million developers worldwide to build unique, personalized experiences for their customers."[4]  Twilio powers this platform through the Segment API, which offers "world-class customer data infrastructure, so [developers] can design hyper-personalized, omnichannel campaigns across all channels."[5]  In particular, once integrated into a developer's mobile application, the Segment API provides Twilio's platform with "customer identification and segmentation"[6] and does this by "collecting and connecting data from other tools and aggregating

---

[4] Glen Weinstein, *What is Twilio? An introduction to the leading customer engagement platform*, THE CURRENT (Nov. 29, 2021) (written by Twilio's Chief Customer Officer.)

[5] TWILIO SEGMENT, TWILIO + SEGMENT ARE BETTER TOGETHER WITH TWILIO ENGAGE, https://segment.com/twilio/.

[6] INGRID LUNDEN, *Twilio Confirms It Is Buying Segment For $3.2b In An All-Stock Deal*, TechCrunch, Oct. 12, 2020, https://techcrunch.com/2020/10/12/twilio-confirms-it-is-buying-segment-for-3-2b-in-an-all-stock-deal/.

the data to monitor performance, inform decision-making processes, and create uniquely customized user experiences." [7]

**B.    Defendant Discloses Class Members' Geolocation Data To Twilio Via The Segment API**

24.    As the dynamic analysis established, Defendant discloses to Twilio, through the Segment API, a user's geolocation.

25.    "Geolocation is the identification of the real-world geographic location of an object." [8]  Geolocation identifies an object by "generating a set of geographic coordinates such a latitude and longitude through GPS and using the coordinates to determine a meaningful location."[9]

26.    Geolocation is considered precise when it provides street level accuracy. Defendant discloses users' geolocation with more than three decimal places of accuracy, meaning Twilio could identify users within forty feet of their actual location.  This level of precision constitutes precise geolocation.

27.    In 2013, researchers conducted a study that analyzed mobility data for 1.5 million people and found they needed only four randomly chosen spatio-temporal points (points that represent the time and location of a specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset. [10]

28.    Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explains that "[r]eally precise, longitudinal geolocation information is absolutely

---

[7] INDICATIVE, SEGMENT.IO DEFINED, https://www.indicative.com/resource/segment-io/.

[8] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[9] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[10] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

impossible to anonymize." [11]   In fact, out of all identifiers, "D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[12]

29.    By disclosing precise geolocation to Twilio, Defendant disclosed information sufficiently permitting an ordinary person to identify a specific individual.

30.    Defendant disclosed this geolocation so it could enhance its marketing efforts, its advertising profits, and its app analytics.

31.    Companies collect and disclose geolocation so they can maximize their advertising revenue.   As a New York Times article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."   Marketers consider geolocation "the Holy Grail of advertising" because it creates "the complete picture that connects all of our interests and online activity with our real-world actions."[13]

32.    Defendant discloses geolocation to Twilio, through the Segment API, for this precise purpose: so Twilio can help Defendant maximize marketing and advertising revenue and conduct app analytics.

### C.    Defendant Discloses Class Members' Advertising IDs To Twilio Via The Segment API

33.    Along with geolocation, Defendant also discloses class members' AAIDs.[14]

---

[11] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy* N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[12] *Id.*

[13] *Id.*

[14] For Google, this is known as the "Google advertising ID."  For Apple, this is known as the "identifier for advertisers."

34.     An AAID is a unique string of numbers that attaches to a device (such as a mobile phone).  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[15]  So, for example, if a third-party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

35.     Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.  The fact that use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Twilio, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).

36.     Using publicly available resources, an AAID can track the user's movements, habits, and activity on mobile applications.[16]  In other words, "[t]he AAID is the passport for aggregating all of the data about a user in one place."[17]

37.     Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.

38.     These inferences, combined with publicly available tools, makes AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

---

[15] *See* ADVERTISING ID, https://support.google.com/googleplay/android-developer/answer/6048248.

[16] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST, Oct. 19, 2017, https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[17] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/

39.     Although an AAID by itself sufficiently identifies an individual, Defendant pairs it with a user's geolocation, which allows Twilio to have a reference point for each location it collects.   In other words, when Defendant transmits location points, Twilio links those points together with the AAID.   These two identifiers allow Twilio to create synergetic inferences about user activity.   With AAIDs, Twilio creates inferences from a user's online activity; with geolocation, Twilio creates inferences from a user's offline activity.

40.     Accordingly, together these two identifiers sufficiently permit an ordinary person to identify a specific individual.

**D.     Defendant Discloses Class Members' Member IDs To Twilio Via The Segment API**

41.     In addition to the foregoing, Defendant also discloses to Twilio via the Segment API a user's member ID.

42.     A member ID is a unique string of numbers corresponding to an Allrecipes App user's account.  The dynamic analysis found that when a user's member ID is transmitted to Twilio via the Segment API, the member ID is displayed in network traffic next to a user's name, such as in the below example:

"userID":<memberid -> 31309474>,"name":<displayname -> "jakie">

43.     Thus, with a name appearing directly next to a corresponding member ID, Twilio could easily identify "Jakie" as "Member ID #31309474."

44.     Defendant discloses the Member ID alongside that user's geolocation and AAID. This combined information sufficiently permits an ordinary person to identify a specific individual.

**E.     Defendant Discloses The Videos That Class Members Are Watching to Twilio**

45.     As the dynamic analysis established, when Defendant transmits a user's geolocation, AAID, and member ID, it also transmits the "recipe ID," which identifies the video being watched.

46.     Each recipe on the Allrecipes App includes a video showing the recipe's preparation.  When a user watches the recipe preparation video, Defendant discloses the recipe ID to Twilio via the Segment API.

47.     The video ID sufficiently permits an ordinary person to identify what video a user is watching.  Indeed, the only step a user need take is opening a web browser, navigating to a search engine, and querying the video ID alongside "Allrecipes."   Searching "allrecipes 12682," for example, shows results for its corresponding video, "Apple Pie by Grandma Ople":



48.     An ordinary person can also find the video by simply navigating to the Allrecipe's website, which in its own URL shows the recipe ID next to the title of the corresponding recipe:

49.     Given this already public level of disclosure, upon information and belief, Defendant provides Twilio with backend tools to match a video ID to a video's title so Twilio can help Defendant enhance its marketing and advertising efforts.  Providing these tools along with the video ID sufficiently permits an ordinary person to identify the specific video watched.

**F.     Twilio Combines These Identifiers to Identify a Specific Individual's Video-Viewing Behavior**

50.     Twilio combines a user's geolocation, AAID, Member ID, and video ID to identify a specific individual's video viewing behavior.  This, in turn, allows Twilio to enhance Defendant's advertising and marketing efforts.

51.     Twilio entices developers to integrate the Segment API by underscoring its signature feature: "Personas."  Personas "is a powerful personalization platform that helps you create unified customer profiles."[18]  Twilio creates these "unified customer profiles" by "tak[ing] event data from across devices and channels and intelligently merg[ing] it into complete user- or account-level profiles."[19]  Twilio then illustrates what developers, like Defendant, can expect:

---

[18] SEGMENT, DOCUMENTATION, https://segment.com/docs/personas/.

[19] SEGMENT, PERSONAS OVERVIEW, https://segment.com/docs/personas/.



52.     Twilio builds these personas through "Segment Identity Resolution."  This process "merges the complete history of each customer into a single profile, no matter where they interact with your business."[20]  The Segment Identity Resolution supports, among other identifiers, "cookie IDs, device IDs, emails, and custom external IDs," helping Twilio capture "a user's interaction across web, mobile, server and third party partner touch-points in real-time[.]"[21]  The Segment

---

[20] SEGMENT, PERSONAS IDENTITY RESOLUTION OVERVIEW, https://segment.com/docs/personas/identity-resolution/#:~:text=The%20Segment%20Identity%20Graph%20merges,they%20interact%20with%20your%20business.

[21] *Id.*

Identity Resolution then combines these "multiple external IDs," into "one persistent ID,"[22] culminating into its offered Persona:



53.     With Identity Resolution, Twilio associates a users' AAID with a corresponding Persona Profile on Twilio's platform.  Because Twilio assembles information from other sources into the Persona Profile, with AAID alone Twilio identifies a particular person.

54.     Twilio leverages these profiles to assist developers, like Defendant, enhance their marketing, advertising, and analytics efforts.

55.     Defendant discloses users' PII to Twilio, through the Segment API, so it can better target its marketing campaigns.  Defendant does this through Twilio's "Audience" feature, which "define[s] cohorts of users or accounts based on their event behavior and traits that [Twilio] then

---

[22] *Id.*

keeps up-to-date over time."[23]   In other words, Audiences allows for targeted marketing at Persona profiles that fit specific parameters.   As explained below, Defendant builds these marketing campaigns through Twilio's analytic services.

56.     Defendant also discloses users' PII to Twilio, through the Segment API, so it can better target advertisements.   After Defendant discloses users' PII, Twilio compiles and transmits that information to other third parties that Defendant utilizes for targeted advertising.[24]   These third parties include Facebook, Google, and Salesforce.[25]   Twilio labels these companies "Personas Destinations," which it describes as "industry-standard tools that most businesses use for personalization and marketing."[26]   In this role, Twilio acts as a facilitator, compiling PII so developers can "personalize messages across channels, optimize ad spend, and improve targeting."[27]   When Twilio transmits PII to Facebook, for example, it sends "an expanded list of identifiers or traits to Facebook, so that Facebook can try to use these additional datapoints to match to their user profiles."[28]   The same goes for Google, with Twilio helping developers "run advertising campaigns without having to manually update the list of users to target in Adwords campaigns."[29]   Defendant utilizes Twilio to amplify its advertising campaigns.

---

[23] SEGMENT, PERSONAS AUDIENCE OVERVIEW, https://segment.com/docs/personas/audiences/#.

[24] SEGMENT, USING YOUR PERSONAS DATA, https://segment.com/docs/personas/using-personas-data/.

[25] Id.

[26] Id.

[27] Id.

[28] SEGMENT, PERSONAS FACEBOOK CUSTOM AUDIENCES DESTINATION, https://segment.com/docs/connections/destinations/catalog/personas-facebook-custom-audiences/.

[29] Id.

57.     Defendant likewise discloses users' PII to Twilio, through the Segment API, so it can better measure and analyze the App's performance.   Defendant does this by leveraging Twilio's "Personas" feature, which breaks down user profiles into a number of traits, like  how many e-mails a customer received, how often a customer has made purchases, and even a customer's favorite color:



58.     Defendant then builds marketing campaigns based on this analysis.  For Allrecipes, Defendant selects traits like "e-mails received" or "videos viewed" and sends distinct marketing e-mails and advertisements to users who have those traits, as the below flowchart illustrates:



59.    Twilio describes the above process as "building an Audience,"   meaning it "[c]reat[es] lists of users or accounts that match specific criteria."[30]   As an example, Twilio lets

---

[30] Segment, Personas Audiences Overview, https://segment.com/docs/personas/audiences/.

developers "create[e] an 'inactive accounts' audience that lists paid accounts with no logins in 60 days, developers can push the audience to your marketing and analytics tools."[31]   And if a developer want a historical vantage point, Twilio offers the "Profile Explorer" feature.[32]

60.     In short, Defendant utilizes the Segment API to analyze user data, launch marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this, especially in conjunction with Segment's marketing and advertising services, helps Defendant monetize its App and maximize revenue by collecting and disclosing as much PII as possible to Twilio via the Segment API.

61.     Based on the above, it is abundantly clear that Defendant intentionally and knowingly discloses users' PII to Twilio via the Segment API.

62.     Defendant dispels any doubts about that through its case study extolling the Segment API.[33]  As the case study notes:

> Meredith turned to Twilio Segment to scale data standardization across its more than 30 brands and centralize data collection to ensure data is available across the organization. That access and visibility enables downstream analytics tools to incorporate a wider consumer dataset to enable new cross-brand insights. Using Twilio Segment allows Meredith to combine data from many channels and enable a comprehensive analysis by brand, topic, or other attributes. With the new data structure, the team can run highly-accurate trend analyses and surface predictions that transcended the delivery channel.

63.     The case study goes on to state that Defendant utilizes the Segment API to:[34]

> [C]entralize its consumer data, enabling its teams to collect and distribute data across the organization. That access and visibility would further enable downstream analytics tools to incorporate a wider consumer dataset to enable new cross-brand insights … [B]y standardizing how data for every user interaction with Meredith's

---

[31] PERSONAS OVERVIEW, https://segment.com/docs/personas/.

[32] SEGMENT, PROFILE EXPLORER AND TRAITS, https://segment.com/docs/personas/#:~:text =The%20Profile%20Explorer%20is%20the,to%20their%20traits%20and%20identifiers.

[33] HOW MEREDITH CORPORATION UNIFIED CUSTOMER DATA ANALYTICS ACROSS ITS MORE THAN 30 BRANDS WITH TWILIO SEGMENT, https://segment.com/customers/meredith/.

[34] *Id.*

digital properties is collected, its internal teams could ensure data cardinality so that distinct users could be accurately tracked across properties.

64.     Defendant continues its praise, saying that, "by using Twilio Segment to push standardized data—in real-time—into existing tools, it became easier than ever for Meredith to quickly implement new software."[35]  Moreover, Defendant states, "[d]ata capture standards also made it easy to share data universally, feeding centralized analytics for an enterprise-wide view of users, brands, and its business."[36]

65.     Notably, the case study touches on Defendant's use of the Segment API to collect video-viewing information to make it "easily consumable and understandable by the various teams. For example, Meredith's video data was previously tied to individual streaming channels, such as Roku and Apple TV."[37]

66.     As the case study concludes, "[t]eams from editorial to engineering are taking a more data-driven approach to growing Meredith's bottom line … . Thanks to Twilio Segment's centralized data infrastructure, which underpins their rapid unification of data from a multitude of digital properties, Meredith is poised to successfully scale and grow into the future."[38]

67.     In short, Defendant intentionally and knowingly discloses users' PII to Twilio via the Segment API in order to maximize advertising revenue, derive analytics, and target its marketing campaigns for all its platforms, including the Allrecipes App.  By doing so, Defendant disclosed information reasonable and foreseeably likely to reveal which Allrecipes video users had obtained.

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

IV.     **Experience of Plaintiff Robert Rancourt**

68.     In or about May 2017, Plaintiff downloaded the Allrecipes App on his Android phone.  When Plaintiff set up the Allrecipes App, he enabled location services and created an account.

69.     Plaintiff used the Allrecipes App until approximately April 2022 in the state of Massachusetts.  During that time, he used the Allrecipes App to watch videos of recipes.  For instance, Plaintiff's most recently viewed video was on how to make a decadent Tuscan chicken.

70.     At all times relevant, Plaintiff never consented, agreed, nor otherwise permitted the Allrecipes App to disclose his PII to third parties.

71.     Likewise, Defendant never gave Plaintiff the opportunity to prevent the Allrecipes App from disclosing his PII to third parties.

72.     Nevertheless, each time Plaintiff viewed a video using the Allrecipes App, Defendant disclosed his PII to Twilio via the Segment API.  Using this information, Twilio was able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff in its databases.  Plaintiff's PII was also used to create a "Persona Profile" of his actions on the App, which Defendant uses for marketing, advertising, and analytics purposes.

## PARTIES

73.     Plaintiff Robert Rancourt is, and has been at all relevant times, a resident of Fall River, Massachusetts and has an intent to remain there, and is therefore a domiciliary of Massachusetts.

74.     Defendant Meredith Corporation is an Iowa corporation with its principal place of business at 1716 Locust Street, Des Moines, Iowa 50309.  Defendant develops, owns, and operates the Allrecipes App, which is used throughout Massachusetts and the United States.

## JURISDICTION AND VENUE

75.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).  This Court has supplemental jurisdiction over Plaintiff's RIVPRA claim pursuant to 28 U.S.C. § 1367 because it is "so related" to Plaintiff's VPPA claim that it "form[s] part of the same case or controversy under Article III of the United States Constitution."

76.     This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

77.     This Court has personal jurisdiction over Defendant because the Allrecipes App collected and disseminated the personally identifiable information giving rise to this lawsuit in this District, Defendant conducts substantial business in this District, and the conduct giving rise to this action arises out of and relates to that business.

78.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

79.     **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who used the Allrecipes App with location services enabled to watch videos and had their PII transmitted to a third party (the "Class").

80.     Plaintiff also seeks to represent a subclass of similarly situated individuals, defined as all Massachusetts residents who used the Allrecipes App with location services enabled to watch videos and had their PII transmitted to a third party (the "Subclass").

81.     Collectively, the Class and the Subclass shall be known as the "Classes."

82.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

83.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Classes.  However, given the popularity of Defendant's App, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

84.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

> (a)  whether Defendant collected Plaintiff's and the Classes' PII;
>
> (b)  whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;
>
> (c)  whether Defendant's disclosures were committed knowingly; and
>
> (d)  whether Defendant disclosed Plaintiff's and the Classes' PII without consent.

85.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, used the Allrecipes App to watch videos, and had their PII collected and disclosed by Defendant.

86.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring.  Plaintiff and

his counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes.  Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

87.  **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VPPA,
### 18 U.S.C. § 2710, *et seq.*

88.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

89.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

90.     Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its Allrecipes App.

91.     Plaintiff and members of the Classes are "consumers" as defined by the VPPA because he downloaded, installed, and watched videos using the Allrecipes App, and Plaintiff created an Allrecipes App account.  18 U.S.C. § 2710(a)(1).  Under the VPPA, this means that he was a "subscriber" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).

92.     Plaintiff and members of the Classes viewed videos using the App.  On information and belief, during these occasions the App disclosed Plaintiff's and class members' PII—including the device's Advertising ID, precise geolocation, member ID, and records of the videos that they viewed—to Twilio via the Segment API.

93.     The Allrecipes App's transmissions of Plaintiff and class members' PII to Twilio via the Segment API constitutes "knowing[] disclosures" of their "personally identifiable information" to a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

94.     Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated.

95.     The information disclosed by the Allrecipes App constitutes "personally identifiable information" in this context because it allows Twilio to identify Plaintiff and class members.

96.     Plaintiff and members of the Classes did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

97.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, the Allrecipes App's disclosures to Twilio were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

98.     On behalf of himself and the Classes, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT II**
**VIOLATION OF THE MVPA,**
**Mass. Gen. Laws ch. 93 § 106**

99.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

100.    Plaintiff brings this claim individually and on behalf of the members of the proposed Subclass against Defendant.

101.    The MVPA provides, among other things, that "[n]o persons engaged in the business of leasing or renting videos or any employees thereof shall make available to a third party records that would indicate the name of the borrower or the title or category of any video leased or rented by a borrower, except under a proceeding authorized by 18 U.S.C. §§ 2710(b)(2)(C) and (F)."  Mass. Gen. Laws ch. 93 § 106(2).

102.    Defendant is "engaged in the business of leasing or renting videos" through its Allrecipes App.

103.    Through the conduct alleged above, Defendant has made available to Twilio—a third party—through the Segment API "records that would indicate the name of the borrower or the title or category of any video leased or rented by a borrower."  Specifically, Defendant has disclosed Plaintiff's and the Subclass's Advertising ID, precise geolocation, member ID, and records of the videos that they viewed to Twilio via the Segment API.  This PII is sufficient to identify the identity of Plaintiff and each Subclass member, and the title or category of each video watched by Plaintiff and each Subclass member.

104.    Defendant did not disclose Plaintiff's and the Subclass's PII to "a law enforcement agency pursuant to a warrant issued under the Federal Rules of Criminal Procedure, an equivalent State warrant, a grand jury subpoena, or a court order."  18 U.S.C. § 2710(b)(2)(C).

105.    Defendant did not disclose Plaintiff's and the Subclass's PII "pursuant to a court order, in a civil proceeding upon a showing of compelling need for the information that cannot be accommodated by any other means."  18 U.S.C. § 2710(b)(2)(F).

106.    Plaintiff is permitted to maintain a civil action for a violation of MVPA.  Mass. Gen. Laws ch. 93 § 12.

107. On behalf of himself and members of the Subclass, Plaintiff seeks, for violations of MVPA, actual damages, treble damages, and costs and reasonably attorneys' fees. Mass. Gen. Laws ch. 93 § 12.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated: May 6, 2022                    Respectfully submitted,

                                      **REARDON SCANLON LLP**

                                      By: */s/ James J. Reardon, Jr.*
                                             James J. Reardon, Jr.

                                      James J. Reardon, Jr.
                                      45 South Main Street, 3rd Floor
                                      West Hartford, CT  06107
                                      Telephone: (860) 955-9455
                                      Facsimile:  (860) 920-5242
                                      Email:  james.reardon@reardonscanlon.com

                                      *Local Counsel for Plaintiff and the Putative Classes*

                                      **BURSOR & FISHER, P.A.**
                                      Yitzchak Kopel*
                                      Max S. Roberts*
                                      888 Seventh Avenue
                                      New York, NY 10019
                                      Tel: (646) 837-7150
                                      Fax: (212) 989-9163
                                      E-Mail: ykopel@bursor.com
                                              mroberts@bursor.com

                                      **BURSOR & FISHER, P.A.**
                                      Christopher R. Reilly*
                                      701 Brickell Avenue, Suite 1420
                                      Miami, FL 33131
                                      Tel: (305) 330-5512
                                      Fax: (305) 679-9006
                                      E-Mail:  creilly@bursor.com

                                      *\*Pro Hac Vice Application Forthcoming*

                                      *Attorneys for Plaintiff and the Putative Classes*